2022 IL App (1st) 210487-U
Order filed March 10, 2022

FIRST DISTRICT
FOURTH DIVISION

No. 1-21-0487

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| NICHOLAS MASELLA, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 L 002588 |
| | ) | |
| JPMORGAN CHASE BANK, N.A., | ) | Honorable |
| | ) | Thomas R. Mulroy, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lampkin and Martin concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the granting of summary judgment in favor of defendant on plaintiff's claim of intentional interference with a business relationship where there was no evidence that defendant intended to interfere with plaintiff's business relationships and no evidence that defendant acted with an improper purpose.

¶ 2   Plaintiff-Appellant, Nicholas Masella, a real estate appraiser, filed this action against defendant-appellee, JPMorgan Chase Bank, N.A. (Chase), a financial institution, for intentional interference with a business relationship. Plaintiff alleged that Chase acted with malice when it placed him on a list of individuals ineligible to do appraisals for Chase (ineligible list) and disseminated the ineligible list to appraisal management companies (AMCs). Plaintiff further

alleged that Chase's actions caused AMCs to stop working with him and resulted in the destruction of his appraisal business. The circuit court granted summary judgment in favor of Chase and finding no error in that decision, we affirm.

¶ 3    Plaintiff first filed suit against Chase in March 2017. The third amended complaint (the complaint), the dispositive pleading, was filed on January 29, 2018 and has two counts, intentional interference with a business relationship and "tortious interference with a prospective business expectation."[1] Plaintiff was later granted leave to add a claim for punitive damages. Only the intentional interference with a business relationship count is at issue on appeal and we limit our recitation of the facts to that claim.

¶ 4    In the complaint, plaintiff alleged that, for over 25 years, he was an independent residential real estate appraiser certified by the State of Illinois and operated a business providing appraisals for financial institutions in the Cook County area. Plaintiff maintained that appraisers are bound by certain federal and state standards, practices, and statutes, which preclude them from directly contacting financial institutions to solicit business and prohibit them from disclosing a client's confidential material including analysis and conclusions without the client's permission. Financial institutions arrange for real estate appraisals through AMCs.

¶ 5    Plaintiff alleged that prior to December 2015, "on many hundreds of occasions," he was "regularly recruited" by AMCs to provide real estate appraisal services for financial institutions. Through contacts with AMCs, plaintiff prepared "well in excess of one hundred real estate appraisals annually." Plaintiff contended that based on this substantial work history, he reasonably

---

[1] In the second count, plaintiff alleged that defendant acted "negligently and carelessly." In his brief on appeal, plaintiff referred to this count as an action for "negligent interference with a prospective business expectation" and affirmatively stated that he is not pursuing an appeal of this count.

expected that AMCs would continue to retain him to perform real estate appraisals and that Chase tortiously interfered with this expectancy and his relationships with AMCs.

¶ 6    Plaintiff's suit arises from his performance of an appraisal in December 2015. The facts around this appraisal generally are not in dispute and we now turn to those facts as gleaned from the parties' pleadings and exhibits.

¶ 7    In December 2015, InHouse Solutions (InHouse), an AMC, engaged plaintiff to conduct an appraisal of real property located in the Lincoln Square neighborhood of Chicago at 4535 North Seeley Avenue in Chicago, a single-family home built in 2007 (the property). The InHouse assignment sheet for the appraisal listed Wintrust Mortgage Company (Wintrust) as the "Lender/Client." Wintrust is a division of Barrington Bank & Trust Company, N.A. (Barrington). Plaintiff had performed appraisals for Wintrust in the past. The assignment sheet provided that InHouse had selected plaintiff "as the appraiser for many reasons, including performance metrics, geographic competency, and lender list approvals" and prohibited him from discussing "values with borrowers, agents, loan officers, or other interested parties."

¶ 8    Plaintiff prepared and sent to Wintrust an appraisal report for the property (the report), which included a valuation as of December 11, 2015 of $2 million. Plaintiff's valuation was based in part on seven comparable sales which the report certified were "locationally, physically, and functionally the most similar to the subject property." The report defined the boundaries of the property's neighborhood as "Lawrence Ave. to the north, Clark St. to the south, and California Ave. to the west." Wintrust thereafter extended a mortgage loan to the owners of the property (the owners) for $1.4 million (the mortgage).

¶ 9    In February 2016, Chase purchased the mortgage from Barrington, a correspondent lender of Chase. The transfer of the mortgage was subject to the existing Correspondent Origination and Sales Agreement (COSA), which incorporates Chase's Correspondent Guide (the Guide), a manual containing detailed instructions and requirements for correspondent lenders when submitting mortgage loans to Chase for purchase. Pursuant to the COSA and the Guide, correspondent lenders must provide Chase with the full loan and credit files relating to all mortgages purchased by Chase including any appraisals. The correspondent lenders must use appraisers who meet the standards of the Guide, and the appraisals must be performed in accordance with the applicable law. When it submitted the mortgage for transfer to Chase, Barrington provided Chase with the relevant loan documents, including the report. Chase found the report acceptable at that time.

¶ 10    After Chase acquired the mortgage, the owners sought refinancing from Chase. As a result, Chase requested a new appraisal of the property which was done by Emmanuel Peterson. Peterson appraised the property as having a value of $1.1 million as of June 2016 (the Peterson appraisal), which was $850,000 below plaintiff's valuation of the property just six months earlier and below the amount of the original loan. The Peterson appraisal defined the boundaries of the property's neighborhood as "Foster Avenue to the north; Montrose Avenue to the south; the Chicago River to the west and Ravenswood Avenue to the east," which differed from the report. The Peterson appraisal based the value of the property on four comparable sales which did not include any of the sales that were listed in the report.

¶ 11    Because of the discrepancy in values, Chase followed its established procedures for reviewing an appraisal, for which there is a possible deficiency. First, the matter was referred or

escalated to Chase's Appraisal Escalation Desk (AED). John Cale, a certified appraiser and a member of the AED team, reviewed the report and the Peterson appraisal. Cale concluded that the report was "not credibly supported" and contained "factual errors." Cale raised questions as to the report's definition of the neighborhood boundaries and the relevancy of the comparable properties. Specifically, Cale found as to the comparable properties:

> "Sale 1 was new construction not offered through [the Multiple Listing Service (MLS)][2]. Sale 2 is located 1.17 miles away in a different ZIP code. Sale 3 has an apparently unwarranted Quality of Construction adjustment of $100,000 and located in a different ZIP code. Sale 4 is a sale dated over 12 months, new construction not offered through MLS. Sale 5 is dated over 12 months, different ZIP code. Listing 6 is still an active listing with the current list price now lowered to $1,950,000. This property has been off the market since 05/04/2010 without a sale and would not appear to be reflective of market value." (Footnote added.)

Again, based on Chase's established procedures, Cale escalated the matter to Chase's Value Provider Management Group (VPM).

¶ 12    The VPM monitors the quality of appraisers and reviews appraisals done for loans originated or purchased by Chase. If the VPM identifies a deficiency in the valuation, Chase will send a letter to the appraiser explaining the issues and providing the appraiser a chance to respond. If the response is inadequate or there is no response, the matter is referred to the VPM Advisory Council which will review the matter and if the deficiency is material, it will recommend that the appraiser's status be changed to "ineligible." Chase maintains a list of appraisers which it has

---

[2] Cale described this listing as "not offered to the open market."

found to be ineligible (the ineligible list). Chase will inform the appraiser of the change in their status; the appraiser may appeal their ineligible status at any time and submit any new or relevant information. Chase disseminates the ineligible list to those AMCs which are used by Chase to obtain appraisals. The ineligible list contains only the names and license numbers of the ineligible appraisers and contains no comments.

¶ 13    Julius Green,[3] a certified appraiser and member of the VPM, reviewed the report and concluded that its analysis and conclusion were "unacceptable." Green found that the "appraisal includes a mix of dated and distant sales, a new construction sale that may not have been exposed to the open market, and sales that do not support the concluded value while the analysis includes an unsupported upward adjustment to comparable 3."

¶ 14    According to its procedures, Chase, in July 2016, sent plaintiff a letter (July letter) which raised questions about his appraisal of the property, including plaintiff's use of certain comparable properties and his upward adjustment to one of the comparable sales. Chase expressed its belief that the report's comparable sales did not support plaintiff's valuation and explained that recent sales of similar homes which were built between 2006 and 2009 and in the same vicinity were for less than the value set forth in the report. Chase went on to say that the issues were material and likely impacted the report's conclusions and sought plaintiff's response within 21 days. The July letter warned plaintiff that the outcome of the review "may impact" his eligibility to perform future appraisals for Chase and that "under the Truth in Lending Act [(TILA) (15 U.S.C. §1601, *et seq.*)],

---

[3] Chase's motion for summary judgment spells his surname as "Greene," but exhibit 7 to the motion for summary judgment spells his surname as "Green."

Chase is required to refer certain appraisal findings to the appropriate state licensing agency." Chase stated that it would wait for plaintiff's response before taking any action.

¶ 15    Plaintiff believed that he could not respond to the July letter without Wintrust's permission. He spoke to an agent of the Illinois Department of Financial and Professional Regulation (IDFPR) who confirmed his belief. Additionally, in his deposition, plaintiff testified that he understood any status change would prevent him from doing appraisals for Chase only and he had never performed appraisals for Chase. Plaintiff did not respond to the July letter.

¶ 16    In August 2016, Shawn Moynihan from the VPM group contacted plaintiff by telephone. Plaintiff acknowledged his receipt of the July letter and informed Moynihan that the IDFPR instructed him not to respond to the letter. Plaintiff told Moynihan that he wanted to answer Chase's concerns and asked if Chase would pursue its review of the report through InHouse.

¶ 17    The mortgage was fully paid by the owners in September 2016 but not through refinancing with Chase. On October 4, 2016, a release of mortgage was filed with the Recorder of Deeds. Nevertheless, Chase continued with its internal review of the report.

¶ 18    On September 22, 2016, Moynihan spoke to an individual with the IDFPR and learned that it instructs appraisers to provide information about an appraisal only to the original client "for liability purposes." On that same day, Moynihan, in a phone call, asked plaintiff to obtain Wintrust's permission to respond to the letter. Plaintiff asked Moynihan to email him a "formal request" that plaintiff could forward to Wintrust. Moynihan, on the same day, followed this phone call with an email to plaintiff in which Moynihan noted that "it sounded like [plaintiff] had a good rebuttal" to the July letter. Moynihan explained that plaintiff's response must be in writing and Moynihan understood plaintiff wished to first get Wintrust's permission. A few days later plaintiff

sent Moynihan an email stating that he had contacted Wintrust and would keep Moynihan posted of his progress. On October 17, 2016, plaintiff asked Moynihan for a copy of the July letter so that he could forward it to Wintrust. Moynihan emailed the July letter to plaintiff and told him that the report would be reviewed by the VPM Advisory Council in a few days. In the email, Moynihan also informed plaintiff that he could appeal any adverse decision of the VPM Advisory Council. Again, Chase did not receive a response to the July letter or any update from plaintiff.

¶ 19    Plaintiff attempted but failed to obtain Wintrust's permission.[4]

¶ 20    On November 30, 2016, the VPM Advisory Council considered the concerns which had been raised about the report during Chase's internal review process. The council voted to place plaintiff on the ineligible list.

¶ 21    In a letter dated December 2, 2016 (December letter), Chase notified plaintiff that his appraiser status had been changed to ineligible and Chase would no longer accept appraisal reports submitted or performed by him. Chase explained that because he had not responded to the material failures identified in the report and explained in the July letter, it was obligated to submit the report to the appropriate state licensing board. The letter did not mention that plaintiff could appeal the change in status; plaintiff did not appeal the determination of ineligibility.

¶ 22    Additionally, Chase, on December 2, 2016, sent a letter to the IDFPR stating Chase "had a reasonable basis to believe that [plaintiff] materially failed to comply with the [USPAP],

_____

[4] Plaintiff testified in his deposition that he had several telephone contacts with various Wintrust employees and a former InHouse employee between 2016 and 2018; no one from Wintrust ever denied or granted plaintiff permission to reply to the July letter. At one point, in early 2017, a Wintrust employee suggested that any future communications to plaintiff would be through the InHouse "portal." Plaintiff was never contacted through the portal. There is no written documentation as to plaintiff's attempts to gain Wintrust's permission.

applicable law, or otherwise engaged in unethical or unprofessional conduct" as to the report and his failures likely affected the valuation. Chase informed the agency that plaintiff did not respond to the July letter setting forth the issues. Chase stated that it was required to inform the IDFPR of its concerns under section 129E of the TILA (15 U.S.C. § 1639(e)).

¶ 23    After plaintiff's status was changed, Chase, according to its standard procedures, disseminated the ineligible list, which now included plaintiff, to AMCs which Chase uses for appraisals "in connection with mortgage loans that Chase originates, services or funds." The ineligible list did not contain any commentary or indication as to the reasons for plaintiff being on the list and Chase never communicates this type of information to AMCs.

¶ 24    Chase transmitted the ineligible list with plaintiff's name according to its established practices. Chase daily sends an email to AMCs which Chase uses for appraisals with the ineligible list, an excel spreadsheet with the names of appraisers with whom Chase has chosen not to conduct business. The email explains that the appraisers are only ineligible to do business with Chase, the ineligible list is to remain confidential, and distribution of the ineligible list is prohibited.

¶ 25    Having set forth the relevant facts, we turn back to the complaint and subsequent procedural history.

¶ 26    In the complaint, plaintiff alleged that the December letter contained threats that Chase would take adverse actions against him if he did not participate in Chase's internal review of the report and claimed that Chase was attempting to influence his independent judgment as a certified real estate appraiser. Further, beginning in September 2016, Chase no longer had a *bona fide* commercial reason to seek information about the report in that the mortgage had been paid by a third party and Chase was not considering any mortgage application for the property at that time.

¶ 27    According to the complaint, Chase knew that its conduct in sending the December letter, finding him ineligible, and disseminating his ineligible status to AMCs was unlawful.

¶ 28    Plaintiff also claimed that because of its "dominance in purchasing mortgages in the secondary market" Chase knew its dissemination of his ineligibility to perform appraisals for Chase that AMCs would not offer appraisal services to plaintiff. And Chase knew that Wintrust and its affiliates would cease using plaintiff's appraisal services in that "on information and belief" Chase was one of the largest purchasers of Wintrust mortgages in the secondary market.

¶ 29    The complaint alleged that in fact upon dissemination of his ineligible status, AMCs, including InHouse, ceased to contract with him to perform appraisals and financial institutions including Wintrust and its affiliates have not engaged him to perform appraisals. As a result, plaintiff's business has been destroyed.

¶ 30    On May 30, 2018, Chase filed its verified answer and affirmative defenses to the complaint. In its factual averments, Chase set forth its contractual relationship with Barrington relating to the purchase of mortgages and its procedures for internal review of appraisals. The factual averments of the affirmative defenses were supported by the affidavits of Chase employees and various documents, including the report, the Peterson appraisal of the property, the July and December letters, the mortgage, the COSA, and the Guide.

¶ 31    As relevant here, Chase asserted affirmative defenses that by failing to respond to the July letter, obtain Wintrust's permission to respond, and appeal his placement on the ineligible list plaintiff waived any claim as to his ineligibility and failed to mitigate his damages. Chase also maintained that its conduct was in accordance with TILA, lacked malice, and was based on legitimate business interests in protecting its mortgage origination and purchasing business.

¶ 32    On June 29, 2018, plaintiff filed his reply to Chase's affirmative defenses. Plaintiff contended that he did not respond to the July letter and did not participate in the VPM process based on his good faith belief that he was prohibited from doing so under applicable laws and professional ethics. He denied Chase's assertion that he "failed to seek/and or obtain permission from Wintrust to speak to Chase" about his valuation.

¶ 33    After the parties conducted extensive discovery, Chase, on April 23, 2020, filed a motion for summary judgment. As to the intentional interference claim, Chase argued that there was no genuine dispute that it acted to protect legitimate business concerns and did not specifically intend to interfere with plaintiff's expectations or business relationships with third parties. In response, plaintiff argued that Chase acted with intent to interfere with his business relationships when it added his name to the ineligible list and that Chase knew its conduct would cause AMCs and financial entities, other than Chase, to cease requesting his services.

¶ 34    On January 7, 2021, the circuit court granted Chase's motion for summary judgment while concluding that plaintiff had failed to satisfy the third element of his intentional interference claim: an intentional and unjustified interference by Chase that induced or caused a breach of termination of plaintiff's business expectancy. The court recognized that Chase was "not required to conduct business with plaintiff." See Restatement (Second) Torts § 766, Comment *b* ("[t]here is no general duty to do business with all who offer their services"). The court found that Chase did not intend to interfere with the plaintiff's ability to perform appraisals for financial institutions other than Chase and that Chase's placement of plaintiff on the ineligible list was not done for an improper purpose but was motivated by a desire to protect its business and customers. The court explained that "[Chase's] vendors were told only that individuals on its ineligible list were ineligible to

perform work for defendant, but even if defendant knew this would result in plaintiff losing business with unrelated parties, the allegation is insufficient as a matter of law."

¶ 35   With respect to plaintiff's claim for negligent interference with a business expectancy (which is not at issue in this appeal), the circuit court found that Illinois has not recognized such a cause of action.

¶ 36   After the circuit court denied his motion to reconsider, plaintiff timely appealed.

¶ 37   On appeal, plaintiff argues that the circuit court erred in granting summary judgment because different inferences and conclusions can be drawn from the facts as to whether Chase intended to interfere with plaintiff's business relationships and whether Chase acted with an improper purpose. Chase argues that there is nothing in the record to support an inference that Chase's actions were unjustified or improper or that Chase intended to interfere with plaintiff's business relationships.

¶ 38   At the center of this dispute are the links between lenders, AMCs, and appraisers and the regulations surrounding these industries.

¶ 39   In the aftermath of the subprime mortgage crisis, many federal and state laws were enacted to combat extensive fraud and predatory lending practices. The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 (2010) was enacted and TILA (15 U.S.C. §1601, *et seq.*) was amended to ensure that appraisers remained independent and that lenders did not improperly assert influence or pressure over the appraised values. To ensure independent appraisals, financial institutions utilize AMCs, which are business entities that retain a network of appraisers and administer them to perform appraisal assignments from lenders, manage the appraisal process, and review and verify the work of the appraisers. See 225 ILCS 459/10 (West

2020) (defining "appraisal management company" and "appraisal management services"). In Illinois, IDFPR regulates the conduct and business practices of AMCs. *Id.* § 459/1 *et seq*.

¶ 40    Appraisers in Illinois must be certified and licensed in conformity with the Real Estate Appraiser Licensing Act (REALA) (225 ILCS 458/1-1 *et seq.* (West 2020)). IDFPR has the authority to administer and enforce the REALA. *Id.* Pursuant to section 10-10 of the REALA, the IDFPR adopted as part of its rules, the Uniform Standards of Professional Appraisal Practice (USPAP) and other federal laws and regulations. *Id.* § 458/10-10.

¶ 41    Although direct contact is mostly prohibited, lenders may ask an appraiser to consider additional information or comparable sales, clarify or explain their conclusion, or correct a factual error as provided by section 129E of the TILA. 15 U.S.C. § 1639e(c). However, the USPAP protects the confidentiality of the appraiser-client relationship by providing that "an appraiser must not disclose: (1) confidential information; or (2) assignment results to anyone other than: the client; [or] parties specifically authorized by the client ****." The REALA defines a "client" as "the party *** who engage[s] an appraiser by employment or contract in a specific appraisal assignment." 225 ILCS 458/1-10.

¶ 42    Section 129E of TILA also includes a mandatory reporting provision:

> "Any mortgage lender, mortgage broker, mortgage banker, [AMC], employee of an
> [AMC], or any other person involved in a real estate transaction involving an appraisal in
> connection with a consumer credit transaction secured by the principle dwelling of a
> consumer who has a reasonable basis to believe an appraiser is failing to comply with the
> [USPAP], is violating applicable laws, or otherwise engaging in unethical or

unprofessional conduct, shall refer the matter to the applicable State appraiser certifying and licensing agency." *Id.* § 1639e(e).

¶ 43     Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). In considering a motion for summary judgment, a court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 34. Summary judgment is a drastic measure and should only be granted when the moving party's right to judgment is "clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). Where a reasonable person could draw divergent inferences from undisputed facts, summary judgment should be denied. *Id.* We review a circuit court's entry of summary judgment *de novo*. *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 15.

¶ 44     The elements of a claim for tortious interference with prospective business advantage include: " '(1) plaintiff's reasonable expectation of entering a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful or intentional interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference.' " *Miller v. Lockport Realty Group, Inc.*, 377 Ill. App. 3d 369, 374 (2007) (quoting *Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 615 (1995)).

¶ 45     Here, the circuit court held that plaintiff failed to meet the third element finding that there was nothing in the record to show that Chase intended to interfere with plaintiff's business

relationships or that Chase acted with an improper purpose when it placed plaintiff on a list of appraisers ineligible to do business with Chase. The parties on appeal have addressed only this element and we similarly limit our analysis to the third element of this cause of action in determining whether summary judgment was properly granted.

¶ 46     As to the third element, "[t]he element of 'purposeful' or 'intentional' interference refers to some impropriety committed by the defendant in interfering with the plaintiff's expectancy of entering into a business relationship with an identifiable third party." *Atanus v. American Airlines, Inc.*, 403 Ill. App. 3d 549, 557 (2010) (citing *Romanek v. Connelly*, 324 Ill. App. 3d 393, 406 (2001); *Dowd & Dowd Ltd. v. Gleason*, 181 Ill. 2d 460, 485 (1998)). A plaintiff must show not only that defendant succeeded in interfering with business relationships, but that there was a "purposeful interference." *Dowd & Dowd*, 181 Ill. 2d at 485 (citing Restatement (Second) of Torts § 766B, Comment *a* (1979)). A claim for intentional interference "must set forth facts which suggest that defendant acted with the purpose of injuring plaintiff's expectancies." *J. Eck & Sons, Inc. v. Reuben H. Donnelley Corp.*, 2013 Ill. App. 3d 510, 515 (1991).

¶ 47     Here, when examined in the light most favorable to the plaintiff, the facts and any inferences which may be reasonably drawn from those facts do not establish that Chase acted improperly and with the intent to injure plaintiff's relationships with third parties. Instead, the facts established that Chase acted to protect its own interests and those of its clients.

¶ 48     When the report's possible deficiency came to light upon receipt of the Peterson appraisal, Chase followed its settled internal procedures for reviewing and investigating a troublesome appraisal. The first steps of the review process, the AED and VPM, uncovered several issues with the report, including plaintiff's choice of comparable properties and his description of the

neighborhood. After the report was reviewed by certified appraisers at each of these steps, Chase found that plaintiff's valuation of the property was not properly supported and not in line with recent sales of similar homes in the vicinity of the property. Only then did it send the July letter asking plaintiff to respond to the issues. Chase offered plaintiff abundant time to obtain Wintrust's permission and to respond to the July letter before sending the report to the VPM Council. In fact, Chase contacted plaintiff by phone and email when he did not respond at all to the July letter. The VPM Council waited until November to consider the report. The VPM Council found that the concerns uncovered during the review process were valid and determined that plaintiff was ineligible to perform appraisals for Chase. Plaintiff was allowed to appeal this decision, but he failed to do so.

¶ 49    Chase in reviewing the report, sending the July letter, and determining that plaintiff was ineligible followed its established procedures. Chase did not deviate from the procedures or treat the report differently in an attempt to tortiously interfere with plaintiff's business relationships. Chase acted to protect its mortgage business and the interests of its clients and there was no indication that Chase acted with an intent to tortiously interfere with plaintiff's business relationships.

¶ 50    Because Chase had chosen to no longer accept appraisals performed by plaintiff, Chase informed the AMCs which were used by Chase to obtain appraisals. Chase distributed the ineligible list which included plaintiff's name to only those AMCs, which had contractual relationships with Chase, notified them that Chase would no longer accept appraisals from plaintiff and other appraisers on the list. The ineligible list contained no commentary only the names and license numbers of the ineligible appraisers. In the emails disseminating the ineligible list, Chase

warns AMCs that the ineligible list is confidential and should not be distributed to third parties. There is nothing in the record to show that the AMCs were prohibited from assigning an ineligible appraiser to other lenders. Again, in disseminating the ineligible list, Chase was not acting improperly nor with an intent to interfere with plaintiff's business relationships.

¶ 51    Plaintiff contends that he satisfied the third element because Chase knew that the dissemination of his ineligibility to perform appraisals for Chase would result in AMCs not retaining him for other financial institutions which may seek to sell their mortgages to Chase. The intent required for the third element may be met if the evidence shows the defendant had a desire to interfere with a plaintiff's business relationships or "knows that the interference is certain or substantially certain to occur as a result of his action." Restatement (Second) Torts § 766, Comment *j*. As discussed, there is no evidence that Chase desired to interfere with plaintiff's business relationships but rather acted to protect its commercial interests. Moreover, even if Chase knew or was substantially certain that AMCs would no longer retain plaintiff for other financial institutions, plaintiff was still required to show that Chase acted improperly despite these incidental consequences. *Id.* We find that there is no evidence upon which to establish Chase acted in an improper way. See *Id.* ("If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.")

¶ 52    Plaintiff does not argue that there are material issues of fact which precluded summary judgment. Instead, he argues that divergent inferences may be drawn as to Chase's motives based

on the circumstances surrounding Chase's letter to the IDFPR and the fact that the mortgage was paid before Chase found him ineligible and disseminated the ineligible list. We do not agree.

¶ 53    In the body of letter to the IDFPR, Chase does state that plaintiff had not responded to the July letter. Plaintiff argues that Chase knew that he needed Wintrust's permission to respond to the July letter and that the IDFPR had confirmed that permission was necessary. Plaintiff maintains that by reporting him to the IDFPR, Chase acted improperly and demonstrated its malice.

¶ 54    Chase sent the letter to the IDFPR only after completing its full review process which uncovered several problems with the report. Chase's letter to the IDFPR began by stating that Chase had "a reasonable basis to believe" that plaintiff had materially failed to comply with the USPAP, other applicable laws, and ethics rules and that Chase was submitting the letter pursuant to the requirements of section 129E of the TILA. As was discussed, this section requires lenders to make a report to the proper agency under such circumstances. The evidence shows that Chase sent the letter to the IDFPR based on its belief that it was required to do so under TILA.

¶ 55    Chase's financial interest in the mortgage did cease when the mortgage was paid. However, Chase had a continuing interest in protecting its mortgage business and in obtaining valid appraisals when extending loans to its clients for purchasing mortgages. In subjecting the report to the various steps of its review process, Chase was seeking to determine whether it would be prudent to have plaintiff perform appraisals for mortgages which Chase would originate or acquire in the future. Chase was acting to protect its business interests by not ignoring the issues it had uncovered in the report.

¶ 56    In summary, the Peterson appraisal raised concerns that the valuation in the report was inflated and that the original loan amount may have been greater than the true value of the property.

Chase followed its internal procedures for reviewing a deficient appraisal and the review raised specific material issues which Chase believed may have impacted the report's valuation. At the end of the process, Chase made a determination that it no longer would accept appraisals that were performed by plaintiff, placed him on the ineligible list, and disseminated the ineligible list to those AMCs which retain appraisers for Chase. There is no evidence that Chase acted with improper purpose or malice toward plaintiff.

¶ 57    For the reasons stated, we find that the circuit court did not error in granting summary judgment for Chase as to plaintiff's claim for intentional interference with a business relationship. Further, in failing to present arguments on appeal, plaintiff has forfeited review of any errors in the granting of summary judgment on his claim of "tortious interference with a prospective business expectation." See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). We affirm the summary judgment in favor of Chase.

¶ 58    Affirmed.